The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw a nine and give their attention. The Court is now sitting. God save the United States and His Honorable Court. Be seated, please. Thank you very much. Before we begin, I'd just like to express our gratitude for being here in this just lovely law school in this courtroom, which is named after our former colleague, Judge Karen Williams. Her portrait's over here on my left. And it's just an honor to be here. I'd also like to express on behalf of the Court our gratitude to Judge Shedd for his invitation and Dean Wilcox for his hospitality here. It has been unusual. We go to court in Richmond and we fend for ourselves. The clerks, of course, are there, are very hospitable also. We have a clerk in the Richmond court there. There's also something I'd like to say about my warm and generous friend, Dennis Shedd. This is the last sitting that Judge Shedd will make as an active judge. He has announced to the President that he is going to take senior status at the end of business today. And I don't know whether end of business today is at the end of the day or after we finish court today. Finish in court today. By going senior status, he does create a vacancy on the Fourth Circuit from South Carolina. And so the President will fill that vacancy. But I must say we have been a very lucky court to have Judge Shedd sitting with us. He's been a judge for over 27 years. And I'm just not sure why he wants to quit now. You would think it gets to be habit forming. But over the years, he's risen to become one of really the finest judges in the Fourth Circuit and maybe the nation. You can always count on his clear eye, his clear thinking, his decisiveness, and his foundational moral precepts in his decision making. I've always had a personal pleasure of sitting with him. And I found it very valuable. I want to extend the court's thanks for Judge Shedd and our appreciation. So I'd like to just make this observation today for the purpose of this hearing. You don't dedicate hearings. We're actually here to hear real court business. And, of course, the business of the parties is our first concern. But in the sense that we sit as a court, as an institution, it seems to me it's fitting that we have this one dedicated to Judge Shedd. All right, we'll proceed. Thank you very much. All right, Mr. Parker, we'll listen to you. May it please the court, my name is David Parker. I'm from Harrisonburg, Virginia, and I represent the appellant, Carolyn Edlund, in this case. Your Honors, to start off with, this case revolves around charges of witness tampering and obstruction of justice. To completely understand our argument in this case, it's important to understand the relationships of the individuals involved here, as well as a little bit of the background. These charges, the obstruction of justice and the witness tampering charge, really stem from one major event in this case, a Taco Tuesdays. Taco Tuesdays at El Chorro Restaurant in Harrisonburg, Virginia, on June the 16th of 2015, where there was a meeting, a dinner, with Mr. Edlund, the husband of my client, Mrs. Edlund, a friend, Mike Potowski, and a friend, Mike Potowski, who was there. To understand what went on at this meeting, we need to understand a little bit about who Mike Potowski was, who Carolyn Edlund is, and their relationship with Felix Chujoy, who is Carolyn Edlund's co-defendant. I think you can assume that we know the facts in the case, and I don't want to stop you from your argument, but I'd go to the relevant facts, and then we'll go to the legal issues, but let you get some of the facts, because of some of the folks we have here to listen. We know the facts of the case, but we'll let you explain the facts, as they matter to your legal argument. Thank you, Your Honor. Mrs. Edlund had known Felix Chujoy for some time, since he was a little boy, a middle schooler, in Warrington, Virginia. Felix Chujoy had actually followed the Edlunds to Harrisonburg when they moved from there, to Harrisonburg when he went to James Madison University. During his period there, he continued to have relationships with the Edlunds. He would bring friends over, including Mike Potowski, to their house. Now, let me ask you this. Let's get to the nub of it. Did your client go and meet with this witness when it became clear to Mrs. Chujoy? How do you say that? Yes, sir. Felix Chujoy. Mr. Chujoy was trying desperately to get in touch with this witness, correct? Yes, Your Honor. And the witness wouldn't respond and wouldn't talk to Mr. Chujoy, correct? Yes, Your Honor. Mr. Chujoy sent your client to talk to the witness, correct? Mr. Chujoy sent her a letter asking her to talk to him. Is that correct? Yes, Your Honor. So when he couldn't go talk to the witness, he had her go do at least part of his bidding, correct? Yes, Your Honor. Okay. And so she went and talked to him? She did. And when you look at the transcript of what they said, there's an argument to be made she really wasn't trying to tamper with the witness, but there's an argument to be made that she was. Isn't that correct? That's correct, Your Honor. Well, if that's the case, don't you lose our standard of review? No, Your Honor. I think when you look at the facts in the case, look at the context of this conversation. Yeah, let's talk about that context. Yes, Your Honor. In this case where she told him not to bring his cell phone in the building, and if he had it, to sit on it so nobody would know what their conversation was? That's correct, Your Honor. Well, that gives some context to what she was doing, don't you think? It gives a context, but she had done that many times before when they had met. So two wrongs make a right. No, sir. It certainly does not. Give me a legitimate reason why she would do that. The legitimate reason is that she testified, Your Honor, was that she believed that the government was listening in on all these cell phones in this case. You have to understand, she was legitimately scared and felt like she was going to be arrested. She didn't think that her and her husband were going to be arrested at any time. For what? They didn't know. They didn't think they'd done anything wrong. They didn't think that Felix or his mom had done anything wrong in this case or those people. So you think that helps your case to say she was afraid she might get arrested, too, so she really wanted to talk to a witness who might know something about what had happened? Well, she was having dinner. She wanted to talk to the witness. She wasn't just having dinner. She wanted him there. I thought we already set the fact that this whole conversation, certainly on her part, was motivated because Chewjoy, who was in jail, tried desperately to get this witness to talk to him, and the witness had nothing to do with Chewjoy, so Chewjoy really delegated your client to go talk to the witness. That's really what happened, isn't it? Yes, Your Honor, but the reason why he wanted to go talk to him and the reason that Ms. Edlin did talk to him is what's at issue here. This is what goes into the corrupt persuasion. Did she knowingly and dishonestly try to impede him to do something? You argued to the jury on these facts she absolutely did not do so, right? You argued on these facts that your client did not try to corruptly persuade the witness, correct? That's correct, Your Honor. And the government, I bet, argued just the opposite, didn't they? They did, Your Honor. And the jury sided with the government. Sometimes the juries get it wrong, Your Honor. Yes, sir. But we have to review this very deferential standard, don't we? You do. The question is could any reasonable jury looking at this fact believe it was witness tampering, correct? That's correct. That's a pretty high standard, don't you think? It is a high standard, but I don't think it's met here. I don't think the facts bear out. The fact that she dishonestly tried to influence or impede any sort of proceeding whatsoever. And to answer a little bit of the question before about the cell phones, okay, they were afraid. Phelan Strugoli was arrested for the second time in her driveway in front of her. Her husband, Mr. Edlund, went and paid for their – they have a special needs kid and paid for the special needs kid's rent for three months just in case they got arrested and locked up in this situation. What does that have to – I don't understand. What does that have to do with the government? It goes to her paranoia, Your Honor, in regards to any sort of government. Did you make that argument to the jury? Yes, sir. Yes, sir. Well, you're kind of stuck by the fact the jury just didn't accept your argument. You have to show us basically as a matter of law your version of the facts has to be accepted. Yes, sir. Didn't the judge below say there's some contradictions, there's some inconsistencies, but I'm going to leave that up to the jury to decide? He did, Your Honor. He did. But I think the evidence is simply overwhelming here, that she was not dishonest in any way whatsoever. During this meeting at El Charro's, she repeatedly told – You know, the trouble with just focusing on the meeting is it doesn't take account of the facts that the government proved that set up the meeting. It seems to me that there are a lot of things that can be focused on, but the essential sequence that the government relied on, I believe from which the jury reached its conclusion, was it began with the June 3rd letter that Tujoy wrote from prison. He wrote a letter to her, didn't he? That's correct, Your Honor. And didn't he say in the letter that he had read, the government had shown him the statement that Kiyokoski was giving in the case? That his lawyer had brought to him in jail. Yeah, he got that in discovery, and he read it to his client in jail, and he was very upset by what was in that statement, wasn't he? Yes, Your Honor. And he wrote a letter to your client saying, I'm very upset, he got it wrong, and tell him I was just joking, and asked her to go to him and do that, right? That's correct, Your Honor. And then immediately after receiving that letter, she sends emails to Kiyokoski several times saying, it's urgent, I see you. That's correct, Your Honor. And then she talks about the letter, and then she starts to say exactly what Chia Chu had told her to do. Tell him I was joking, tell him I was lying, he's got it wrong. Yes, Your Honor. Now, isn't that managing the evidence? No, Your Honor. She stated in the meeting that Chu Joy sent her this letter, and this is what he says in this letter to Mr. Kiyokoski. She goes through and talks about all the times Chu Joy lied because he has this funny sense of humor, that he says the wrong thing and then sort of says, I got you. And she was trying to explain to him that everything he said basically to the government was a lie and you misunderstood Chu Joy. She was basically trying to change Kiyokoski's evidence, and Kiyokoski says, oh, oh, during the course of this conversation. But she's following the script that Chu Joy wrote from prison in that letter. Yes, Your Honor. We have a sufficiency of the evidence. And the question is, could a jury conclude from that sequence of events, those three events, number one, the letter from prison, number two, her effort desperately to get and say, I can't talk with you on the phone. I want to talk to you. And he's not responding, and she's still saying, I need to see you. And then that meeting, and he's wired, and everything is spoken. We have the full transcript of the meeting. And then she's saying, put your cell phones underneath. They're listening. All of that. A jury could conclude from that, couldn't they? Not if they look at the whole context of the conversation at El Charro, Your Honor. I mean, it lasted for over an hour. They talked about all kinds of things. Of course, they're friends. They are. They were friends, Your Honor. She's known him since he was 10 years old. Yes, sir. Yeah. They have. And she treats him, okay, with parental advice. Parental advice. Talking about what he told the government. Talking about the business, whether he was a manager. In other words, the whole issue against Tujoy was whether they were paying at the restaurant, whether they were paying people below rates. These were aliens who were working there for no wages, below legal wages. And the government was conducting an investigation of the restaurant. And Tujoy was on the hot seat. He was actually in jail now. That's correct, Your Honor. And here is this mother figure who says, he's my friend. And Tujoy writes her and says, help me make sure Kiwakowski understands he didn't know what he's talking about. And so she goes and tells Kiwakowski, you didn't know what you're talking about. She tells him to tell the truth, though, Your Honor. Multiple times. To tell the truth. She tells him to make sure that he looks at subpoena. Where does she say that in there? She says that multiple times in the record, Your Honor. It was in the transcript. I mean, I thought she was just correcting things and saying that that wasn't true, he was lying, this type of thing. I don't know if she ever outright, did she outright tell him to tell the truth? Yes, Your Honor. No, I accept it. That's fair enough. Tujoy appendix 271. Okay, thank you. But you don't think that ends the discussion, though? No, Your Honor. No, no. You think you can have witness tampering even if in the conversation you tell the witness to tell the truth, you think that? If you don't really believe that you want them to tell the truth. Yes, Your Honor. No, but my question is, somebody who's tampering with the witness can say to that witness, among other things, tell the truth. You could still be convicted, couldn't you? Yes, Your Honor, if you don't mean it. Is your argument that she was trying to persuade him, but she wasn't corruptly trying to persuade him? Yes, Your Honor, yes. So you say she could persuade, but it wasn't the corrupt needed under the statute? Just as in Arthur Anderson, the court states there that you can impede, try to impede a proceeding, of course, okay? But unless it's corruptly, knowingly and dishonestly in doing so, it's not a violation of the law. I think Supreme Court says what? Consciously, knowingly corrupting. Yes, Your Honor. Consciously, the court added that element, said Congress added that element basically to say that she was aware of what she was doing in this context. That's correct. Are you conceding that she was trying to persuade him? She was trying to persuade him. No, no, I'm asking the question. Yes, Your Honor. You can answer yes or no. Are you conceding, that's why I asked about your argument, are you conceding she was in fact trying to persuade him? I think she was, Your Honor. Okay. I think our fact can find that. So you just want to rise and fall on the corrupt? Corrupt persuasion, yes, Your Honor, I believe so. And this is a situation very similar.  Yes, Your Honor. And so you're saying that your challenge is to the sufficiency of the evidence for the aspect that is corruptly? That's correct, Your Honor. And so if there's evidence to support the jury, we have to give the government the deference? You do have to give them deference, Your Honor, I understand. That's a heavy standard, isn't it? It's a very heavy standard, Your Honor, it is. I think that's method here in this case. This is the very same situation as in Arthur Anderson that they stated in that case where you have a situation where a mother gives a son advice not to take the fifth and not to testify on that. That is not corrupt persuasion. That doesn't fall under witness tampering. Well, how do you characterize what it is she's trying to persuade him to do? I mean, how do you characterize the persuasion if it's not corrupt? She's trying to persuade him to tell the truth, to go to the trial. As the subpoena has set out, she tells him how to do that. Does that imply that he didn't tell the truth the first time when he told the officers what he told them? I think it may imply, and I'm not sure, there's no evidence that she knew exactly what he told them. That was just from Mr. Chujoi. Not exactly, but Chujoi said that he said wrong things in that statement. He was very upset, and he says if they believe that, it's going to get – I'm in for a huge amount of trouble, right? Yes, Your Honor. All right. I see your red light's on. You have rebuttal? Yes, Your Honor. Okay. Mr. Carlton. Ms. Carlton. Thank you. Good morning, Your Honors. May it please the Court. I'm going to turn first to an issue raised by Judge Shedd. Yes, the standard that we are here today for does favor the government in this instance. Under this Court's Feidler decision, when there are differing interpretations of the evidence, the evidence, the jury decides that. And here, the jury decided for conviction after hearing all the facts of the case. Well, of course, the jury could be deciding without evidence. They could be just listening to you. You say convict, and they could do it. Our task is to decide whether the jury had sufficient evidence to reach that conclusion, a reasonable jury. That's correct. That's correct, Your Honor. That's the standard. But as the appellant has just conceded, there were several facts in this case that the jury could hear, and they could interpret it for guilt or for innocence. And here, the jury interpreted it for conviction. Well, why don't you tell us, I think he said, you heard what he said, he thinks there was persuasion. He says, and by the way, there was no force of threat, right? There was no force of threat in this case. That's correct, Your Honor. And so he, his argument focuses on whether or not her conduct was corrupt. He says she tried to persuade him. What evidence is there, and how do we see a jury could find her persuasion being corrupt? Here's how you know that Carolyn Edelen had a consciousness of wrongdoing, as required by author Anderson in the Supreme Court, by the Supreme Court's decision. One, let's step back even further than the facts Judge Niemeyer mentioned a second ago. There was a March 2015 meeting that the jury heard evidence about. That was in the privacy of Ms. Edelen's home. And during that meeting, she did not allow the witness to bring his cell phone into her house, because as we later learn, she's concerned that the government would be listening to what's being said. She wants to conceal her behavior from law enforcement. And during that dinner, she tells the witness, if you're asked by law enforcement, you know nothing. So we'll start at the March dinner as the first evidence of consciousness of wrongdoing. Is that when she told them, if they ask you to come down and ask questions, you don't have to go? Yes, Your Honor, the statement is along the lines of, you know nothing if you're asked by law enforcement. Well, that's another part, but the other question was, you don't have to go, too. That happens at the dinner three months later, Your Honor. Okay, okay. Is there anything illegal in her telling him not to talk to the officers? Is there anything illegal in that? Don't go talk to the police. I'm asking, do you think that's illegal in and of itself and makes your case, or do you think that's context for your case? We believe that there's a consciousness of wrongdoing. That's guilt within itself. When you're asking someone not to tell law enforcement information or facts you may have. With that statement, I'm just asking now, it's not the facts in this case I know, but with that statement in and of itself, don't go down and talk to the police officers, would that support a conviction of witness tampering? Yes, Your Honor, because she's not asking him to invoke any type of privilege that he may have. You think the cases where somebody is allowed to say don't talk, it really is somehow involved with the folks, you know, a privilege that person may have, spousal privilege or attorney-client privilege. That's what you think. Other circuits definitely make that distinction, Your Honor, but I'll draw the court's attention to the United States v. Davis decision out of the 11th Circuit last year where the facts of that case are that a father asked his daughter not to testify against him because he could go to jail for a long time. He's simply asking her not to say anything, which is similar to here, don't say anything. And the 11th Circuit, in evaluating witness tampering under 1512, says that that attempt to have the daughter not speak to law enforcement is witness tampering as well as obstruction of justice. I stopped your flow of chronology you were laying out. Thank you. Well, let me turn back to the facts. So after the March 2015 dinner, there's an effort made by Ms. Edlund's co-defendant, Felix Chuhoy, to reach out to Michael Kwiatkowski. It's almost obsessive behavior, over the phone, over and over again, and the jury heard all of that evidence. And when the witness wouldn't go see the defendant who was incarcerated, Chuhoy reached out by letter to Carolyn Edlund, that letter dated June 3rd, and asked her to go speak with the witness because what he is going to say is going to get the defendant in a bunch of trouble. The content of that letter is important. Chuhoy asked Edlund to tell the witness to change the nature of their relationship. Do you think the jury could take from the impassioned effort and desire on the part of Mr. Chuhoy, who's in jail, his impassioned effort to get to this witness, do you think they could take from that that he wanted to get to him to influence him on what he said? Yes, because the jury also heard in this case that after Mr. Chuhoy was originally charged and arrested, charged by the grand jury and then arrested in December of 2014, he was ordered not to contact witnesses in this case. And the jury heard evidence that he potentially used the cell phones of his friends, including Michael Kwiatkowski, the witness here, to contact some of those witnesses. So you think the jury, you think it's a reasonable inference that if the jury looks at Mr. Chuhoy's efforts to get in touch with the witness here and the fact that that was unsuccessful and then it looks like he deputized the defendant to do that form, you think that's all an indication leading from Mr. Chuhoy to the letter that Virginia and I talked about to all indicate context of the corrupt, under the statute, the corrupt purpose? Yes, Your Honor, because it's a mosaic of evidence that the jury is seeing and hearing during trial, especially because the jury heard no evidence of Chuhoy trying to reach out to any other witness other than Michael Kwiatkowski. Could the jury on these facts have found not guilty? Well... Could the jury have returned a not guilty verdict on the facts? The United States wouldn't have been pleased, but they could have. They heard all of the evidence and just as the jury is allowed to interpret that evidence for guilt, they're allowed to interpret it for evidence. You're just saying there were two arguments presented on what the evidence meant and the jury just chose you were grateful for your version of what happened. That's correct. And the trial court also instructed the jury as to the defense for witness tampering which is the sole purpose to tell the truth. The court actually gave a pretty favorable to the defendant instruction on tampering, didn't it? Yes, he did. He gave part of the trial court's instruction was a definition for that consciousness, for that corrupt persuasion. That's very high. It's higher than any of the other courts if you look to some of the other cases from other circuits. It's a pretty stringent requirement. In addition, he took out the burden shifting for the defense and he placed it with the government so that the government essentially had the burden of not only proving guilt beyond a reasonable doubt, but sort of disproving the defense in contradiction. How does that defense work with the element? They look a lot alike. The element you have to prove and the defense that he would have to prove. Aren't they really similar? I'm sorry, which element are you referring to? As to what corrupt persuasion is. So you mean the defense, the sole purpose to testify to tell the truth? Yes. That's correct. The evidence is overlapping. Yes, Your Honor. We're both proving guilt and disproving the defense at the same time by introducing evidence of consciousness of wrongdoing. Yes, sir. So going back to the question of consciousness of wrongdoing evidence, as the judge has laid out, as the court has laid out, Chuhoy directed Edlin to reach out to the witness, and then three days later after he sent that letter, Carol and Edlin went to the jail where jail visits are not monitored, met with Defendant Chuhoy, and two hours later texted Mike Kwiatkowski, the witness, and said she wanted to meet with him. And when the witness asked to have that conversation by text message or cell phone, she refused, saying, you know why, the phones are bugged. So she's, again, trying to conceal her behavior from others, and the others being law enforcement. She also, in those texts, she emphasized that this is very important stuff. Yes, Your Honor. She not only says it's very important. This is not just a greeting. Clearly it was a mission, and she intended Kwiatkowski to understand that she had something important to talk with him about. Yes, Your Honor. In addition, she references in those text messages that if they don't want to meet, that's fine. She'll just tell Felix Chuhoy that it's okay. Again, emphasizing that she's doing this at the direction of Felix Chuhoy, who's not supposed to be talking to witnesses. She then follows those orders and parrots that language about telling the witness. What are we to make of the fact, she did at one point tell him to tell the truth, didn't she? Yes, she did, Your Honor. So we have her saying to him, tell the truth. That's right. What do you make of that? Well, when you look at the statement, she's saying that she has met with Felix Chuhoy's lawyer and that her lawyer has told, the advice the lawyer has passed along is to tell the truth and the defense counsel will fix it. And she's relaying some of that advice to the witness during that conversation. Yeah, but when you say fix it, you mean that's his job to deal with whatever comes out. That's right. She didn't mean fix it like we'll do something improper. No, I didn't mean to imply there was any improper behavior there. But that statement, that's part of one sentence. If you look at that transcript, that's part of one sentence. It's a half a sentence out of a whole hour-long transcript that the jury, that was introduced into evidence. So she said it but didn't really mean it. The jury was left to interpret that. Do you think the jury was just left to decide how much of that conversation really was aimed at getting him to tell the truth and how much that was a throwaway line or used in some way to maybe describe what she was suggesting that he do because maybe she was suggesting she and Chewhart really knew what the truth was? Is that your argument? That's correct because that half a sentence in an hour-long conversation after two conversations is important that we put that in context because also during that hour-long conversation, she instructs the witness not to do anything or say anything. She instructs them that twice. At one time, telling them not to do or say anything because the government is watching. Again, trying to conceal information from the government. She tries to change the witness's story about that restaurant and those workers to a story that would exculpate her co-defendant. She corrects him to try to say more favorable facts about her co-defendant. She said he was a volunteer, he wasn't the manager. That's right. He's totally surprised. She said, how could he profit from under-wage workers? He didn't have a deed. He wasn't on the deed. Chewhart Cowsley said, well, he was the manager. She said, oh, he really wasn't the manager. He was just a volunteer. Like herself. She then throws in, I was also a volunteer. How could you not more clearly be correcting the understanding and the evidence? All right, I understand. Yes, Your Honor. And that's conceded. It's not only conceded in the brief, the appellant's brief, but it was conceded by Ms. Edlin herself when she took the stand at trial in this case. She concedes that she was trying to correct and change the witness's testimony. So really the only issue is this consciousness of guilt. And the jury was also permitted to understand that there was a consciousness of guilt during that June dinner because she also parrots the language from Chewhart. Remember, he's joking. He has a terrible sense of humor. She says it over and over. And also that Chewhart is a liar. And those may seem like minor points, but it's a big point. Because as you saw in the transcript, the witness parroted that to the jury in this case. He went from saying the workers are illegal to saying what Carolyn Edlin and Felix Chewhart wanted him to say, which was the workers are illegal, but Chewhart was always joking. The jury itself got to witness the witness tampering in this case. And when you look at all of those facts in the light most favorable to the government with all inferences for conviction, you will find that there's more than sufficient evidence of Edlin's corrupt intent. And therefore, we ask that her convictions for conspiracy to witness tamper, witness tampering, and obstruction of justice be affirmed. There being no more questions, we'll submit on our brief. Thank you, Ms. Garland. Thank you, Your Honor. Thank you, Mr. Parker. Sorry, it is a- What's your answer to the substantive point at that meeting where Ms. Edlin literally tried to change Kiyokoski's understanding of two Troys' relationship to the restaurant? I mean, she says in the indictment, the original indictment said that she and Felix trafficked people from Peru to work in the restaurant, paid them way below minimum wage, and therefore profited from that. And then she says to him, how could he profit? He wasn't on the deed. And Kiyokoski says, he was the manager. And she says, oh, he was just a volunteer. And he says, he didn't know that. Isn't that trying to change his understanding? Because clearly, he understood Chewjoy to be the manager of the restaurant and to be paying these Peruvian employees below minimum wage. And it looks to me like Edlin's just trying to get him to change that understanding. Now, how do you answer that? The jury heard that. They did, Your Honor. And she was trying to change his understanding of this. I mean, she knew Felix way better than anybody here in what was going on at the restaurant. And she did this at the direction of Chewjoy, who told her, go talk to the witness. He's got it wrong. He didn't understand I was joking. And she then goes to visit him and then sets up these meetings and says, it's very important I talk to you. And they finally get a meeting together a week or so later, and this is the meeting we're talking about. But is she trying to get him to say something that is a lie? What she's trying to get him to do is tell the truth about things. This is the truth. She knows this. You think these statements, he managed as a volunteer, not as an employed employee. And that's what I told them at Homeland. She's telling them what she told the Homeland Security officers. And then she says, you didn't name names, did you? You didn't name names, did you? In other words, she's just going after the very substance of the whole other lawsuit, trafficking in Peruvian workers at that restaurant. And she's trying to get him to have a new understanding based on her assumption that he tattled. He said he told me he's got all these Peruvian people, and he makes a profit that way. On her understanding of the truth, Your Honor, she's trying to get him to correct his statement in regards to what the truth of the matter is here in this situation, which she knows. She disagrees with him as far as whether Felix is a manager or not because of what she knows. She's not trying to corruptly persuade him in any way. Why is she being talked about? She knew she wasn't supposed to talk about the case, about the witnesses. Why is she even talking to Mike? It's easier to call him Mike. Why is she even talking to him about that? I'm not so certain, Your Honor, that she knew she wasn't supposed to be talking to any witnesses or anything. Nobody had instructed her not to do that is my understanding. She knew Chewjoy was not supposed to, right? Not necessarily, Your Honor. He was locked up at this point. He wasn't under pretrial conditions. He wasn't out on bond where he was instructed not to talk with witnesses when he was out on bond. But he was locked up at this point. Witnesses contacted him. Ms. Edlin had a subpoena for this upcoming trial also. Did Ms. Edlin understand why he was re-arrested? Yes, Your Honor. And why was that? Why he was re-arrested? Yes. Because he was using her cell phone, other people's cell phones and so forth, to contact witnesses. That's what the federal authorities had told her. Did she understand that? About that, yes. All right. And it was after that arrest, and he's in jail, that he then calls her and said, you need to talk to Keokowsky. Yes, Your Honor. Okay. Yes, Your Honor. That's true. Which the only reason she talked to him was not to corruptly persuade him, not in any dishonest manner whatsoever. She was just going to persuade him honestly, huh? Yes, Your Honor. She was going to persuade him. Mr. Clark, I'm wondering about this. I appreciate your role here. I'm just listening to your argument. I'm wondering, did you think it was tough arguing this case to the jury or to this panel? I think it's tougher to this panel, Your Honor. By far. Is that far because of the posture of the case you're in? Absolutely. And the standard? The standard is correct. All right. Anything else? No, that's all, Your Honor. Thank you, Mr. Parker. Thank you. As is the custom in the Fourth Circuit, we'll come down and greet counsel and then proceed on to the next case.
judges: Paul V. Niemeyer, William B. Traxler Jr., Dennis W. Shedd